IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| HOLLY THOMPSON, | CASE NO. 3:25-cv-1490 |
| Plaintiff, | DISTRICT JUDGE |
| | JEFFREY J. HELMICK |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Holly Thompson filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying his applications for a period of disability and disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

## Procedural Background

In August 2023, Thompson filed an application for disability insurance benefits and protectively filed an application for supplemental security income.

Tr. 234, 247. Thompson alleged a disability onset date of March 14, 2019.[1] Tr. 235, 247. Thompson alleged disability due to: "spine is missing a bone," degenerative disc disease, post-traumatic stress disorder (PTSD), depression, and anxiety. *See* Tr. 293. The Commissioner denied Thompson's applications initially and on reconsideration. *See* Tr. 91, 92, 115, 116.

In January 2024, Thompson requested a hearing. Tr. 158. Administrative Law Judge ("ALJ") Donald D'Amato held a telephonic hearing in August 2024. Tr. 45–66. Thompson appeared, testified, and was represented by counsel at the hearing. *Id.* Qualified vocational expert Michele Robb also testified. *Id.* Later in August 2024, the ALJ issued a written decision, which found that Thompson was not entitled to benefits. Tr. 23–44.

In September 2024, after the ALJ issued his decision, Thompson appealed the ALJ's decision to the Appeals Council, *see* Tr 231, 358, and later submitted an opinion from PMHNP[2] Christy Cox in relation to that appeal, *see* Tr. 15–22. In May 2025, the Appeals Council denied Moore's appeal, including his request to add PMHNP Cox's opinion to the record, Tr. 1–3, making the

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]    PMHNP is an abbreviation for Psychiatric Mental Health Nurse Practitioner. *Cleveland Clinic*, *Health Library*, PMHNP, https://my.clevelandclinic.org/health/articles/psychiatric-nurse-practitioner-pmhnp **[https://perma.cc/8LJC-6RVU].**

ALJ's August 2024 decision, Tr. 23–44, the final decision of the Commissioner.
*See* 20 C.F.R. § 404.981.

Thompson now presents two issues to this Court:

> 1. The Appeals Council erred by failing to admit the opinion of NP Christy Cox and failing to grant review based on new and material evidence.
>
> 2. The ALJ's highly specific RFC limitations are not adequately supported by substantial evidence, warranting remand.

Doc. 7, at 1.

**Evidence**[3]

The ALJ summarized the undisputed medical and opinion evidence and explained his consideration of that evidence as follows:

> The claimant's testimony included the following information: she rated her typical pain level at 8 on a 1 to 10 scale of increasing severity, which decreases with Lyrica to a level of 6 to 7; she can stand about 10 minutes, but she has to be walking around and she can only walk around the block before this starts to bother her; she can sit about 10 minutes before she needs to get up and move around; she can lift 10 pounds frequently, but she cannot lift more than 15 pounds; she can use the stairs in her home with a railing that helps hold her up; she uses an inhaler for asthma; she takes medications in the morning and usually lies down on a couch for 2 hours while she waits for them to be effective; her son helps her wash dishes and clean up the floor because her ability to bend is limited; her son helps her cook

---

[3]    The recitation of evidence and testimony is not intended to be exhaustive and is generally limited to the evidence relevant to the parties' arguments. Because one of Thompson's arguments concerns evidence that was not presented to the ALJ and presents only a legal issue, that evidence is discussed in conjunction with the appropriate argument.

as well and she lies down again after dinner due to her significant back pain before she takes medications and goes to bed; her psychiatric medications help a little and she is still in counseling trying to deal with her conditions, but it is difficult for her to be around people as she can have panic attacks and she used to isolate and cry when she was working, which led to her being fired from jobs; she has PTSD flashbacks from childhood abuse and recently had a civil protective order issued against her ex-boyfriend, which aggravated her mental health problems; her panic attacks can be triggered by being around men in general and when she feels like someone is judging her while talking to them; her panic attacks last 20 to 60 minutes on average and she sometimes has problems with nightmares that intermittently last all day so she will call her counselor if they are available or talk to her mom, but she often just sits there and cries; her psychiatric medications constantly make her feel tired and it takes a lot for her to be motivated to do anything; she has paranoia and cannot go in grocery stores because she does not like being around too many people, although she does a little better with familiar people she knows; she has difficulty focusing and concentrating on tasks as she is constantly jumping from 1 thing to another, which happens when she is cleaning with her son or talking and she does not have very good social skills; she has peripheral neuropathy down her left leg to the top of her foot and she experiences numbness and tingling in both feet when she walks more than 10 minutes; she falls at least once a month and her most significant fall occurred when she sprained her ankle and hip about 3 years ago; she does not use an assistive device other than railings or a stroller while walking around the block; her right carpal tunnel syndrome results in pain with writing or numbness and tingling while washing dishes or cutting food; she can only was dishes for about 5 minutes without these symptoms and a splint has been suggested for this issue; her pain is increased by reaching up and she has significant problems reaching down to wash dishes as looking down

4

increases her symptoms of pain, tingling, and burning in the back of her neck and shoulders, which sometimes results in holding onto a wall or chair to pull herself back up; and she cannot extend her arms in front without increased pain.

In addition to the medical evidence discussed previously in this decision, the record documents a history of special education services for a learning disability in math calculations and possible reading comprehension along with scoliosis and an affective disorder (B1A and B1F). She received physical therapy, chiropractic care, and trigger point injections for her pain symptoms from late 2019 into early 2020 when she started seeing a counselor for problems she was having with the father of her 2 children (B2F and B3F). She was assessed with polyneuropathy and cervicalgia following a motor vehicle accident in May 2020 as well, although she declined electrodiagnostic testing, and a lumbar orthosis brace was ordered for her low back pain, but she was able to go on trips with other people over the next few months that included a family hiking trip in August 2020 (B2F and B3F). She also told a social worker that she wanted to resume working in October 2020, but she could not due to COVID and homeschooling of her son (B2F). Her psychiatrist encouraged her to stay sober in November 2020 as she admitted to smoking cannabis 5 to 6 times a day and trying ecstasy with her friends, but she reportedly was doing very well at a follow-up in March 2021 as she was not getting angry easily or yelling at her kids and her mood was getting better even though she was anxious at times (B2F).

She subsequently complained of anxiety, nervousness, and feeling tense and tired in July 2021 when Buspar was added to her prescription regimen for anxiety, but she reported that she was doing okay and she was calm and cooperative on mental status examination with intact memory and good insight and judgment despite having an anxious mood and constricted affect (B2F). She continued with counseling services afterwards and

5

said she was working as a babysitter in December 2021 so she could stay home with her children, which was easier, but she missed meeting people from everywhere that occurred with driving a cab (B2F). Her psychiatrist then started her on Vistaril instead of Buspar for anxiety in January 2022, but she was still doing okay and she expressed an interest to her counselor in March and April of 2022 about starting school to become a licensed practical nurse (B2F). No further treatment is documented in the record until she resumed pain management services, chiropractic care, and physical therapy in May 2023 and a referral was provide to a bariatric clinic at her request for weight gain, but she told a mental health provider in August 2023 that she would be going back to work with DoorDash when her children returned to school (B3F, B4F, B7F, and B9F). She also indicated she was doing well and feeling much better since she started seeing a trauma counselor at a follow-up for anxiety and depression later that month, and a left sacroiliac joint injection was administered, which relieved her pain symptoms by 50 percent for 1 week (B4F, B6F, and B7F).

She did express some grief following the loss of her dog in September 2023 and she reported ongoing struggles with chronic pain, but a new puppy was helping her so much and she was obtaining money by working for DoorDash (B9F). A trial of gabapentin was also initiated for numbness and tingling on the top of her left foot that started after electrodiagnostic testing was completed on her lower extremities, which caused excessive drowsiness as a side effect so this medication was changed to Lyrica in October 2023 and dietary modifications were recommended for obesity (B6F and B7F). During that period, State agency consultants, Irma Johnston, Psy.D., and Rannie Amiri, M.D., initially determined that she could perform work at the light exertion level with the following exceptions: she could never climb ladders, ropes, or scaffolds, she could occasionally stoop or crawl, she could frequently kneel, crouch, and climb ramps or stairs;

6

she needed to avoid all exposure to unusual hazards such as operating heavy or hazardous machinery and unprotected heights; she was limited to simple 1- to 4-step tasks that would be routine in nature and not fast-paced; she could have superficial interactions with co- workers, supervisors, and the general public; and she could adapt to routine changes (B4A and B5A).

After establishing care with her current psychiatric provider, she reported plans to start working for Spark as a grocery deliverer in November 2023 and that medications were helping with anger, sleeping, energy, concentration, depression, and anxiety, although she was still having some issues with irritability, anger, and motivation (B9F). She also agreed to an increased dosage of Lyrica as she denied having any side effects from it before State agency consultants, Janet Souder, Psy.D., and W. Scott Bolz, M.D., affirmed the prior administrative medical findings of Drs. Johnston and Amiri on reconsideration in December 2023 (B8A, B9A, and B8F). Medical evidence received at the hearing level indicates that she got a job driving a taxi using her own car at that time and she did complain of feeling tired often at a follow-up with her psychiatric provider in January 2024 when Vitamin D3 was added to her prescription regimen, but she stopped working as a taxi driver in February 2024 because she lost her car in an accident and she quickly started looking for another job afterwards (B14F). Her psychiatrist subsequently started prescribing lamtrogine as well, which helped her work through her depression as she felt more stable in March 2024, and her dosage of quetiapine was increased in April 2024 when she was feeling overwhelmed about not finding anyone to help her move, but she was doing well again in May 2024 after moving into her house with moods that were more positive and stable, although the dosage of quetiapine was decreased as she reported it made her feel too tired (B14F). The most recent psychiatric report contained within the record from June 2024 additionally noted that she was still having panic

attacks at night and she had a nightmare for the first time in 3 to 4 weeks, but she was having fewer episodes during the day, her moods were a little better, her anxiety was mostly only an issue when she had to be out in public, her energy and motivation were stable, her concentration was intact without distractibility, she was sleeping through the night to feel rested, she was attending work as scheduled, her depressive symptoms were not persistent, her pervasive irritability was controlled, she was tolerating medications well, and her meaningful relationships were intact (B14F).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. The record documents a history of various interventions for chronic pain, but Dr. Hassett did not think the very minimal severity of her right carpal tunnel syndrome explained her symptoms, an MRI of her lumbar spine from June 2023 detected only minimal degenerative changes of the lower spine without associated stenosis, electrodiagnostic testing of her lower extremities from September 2023 was normal, she exhibited full motor strength throughout on neurological exam in May 2024 with intact sensation and normal attention, concentration, coordination, and gait, and her reports generally reflect improvement with treatment (B1A, B3F, B4F, B5F, B6F, B7F, B8F, B10F, B12F, B13F, and B15F). The undersigned has also considered her testimony in allowing her to briefly alternate between sitting or standing for 2 minutes every 15 minutes throughout the day as changing positions seems to help manage her symptoms, but her allegations of not being able to lift more than 15 pounds, needing to lie down for several hours during the day, falling at least once a month, having difficulties with reaching in any direction or looking down, and experiencing

8

increased symptoms in her hands after using them for just 5 minutes are not well corroborated by the overall evidence of record since the alleged onset date (B4A, B5A, B8A, B9A, B3F, B4F, B6F, B7F, B8F, B10F, B12F, B13F, and B15F).

As for her mental health, she has also received a variety of treatment for PTSD, anxiety, bipolar disorder, and learning disability as these conditions understandably result in some ongoing issues with social interactions, panic attacks, nightmares, motivation, paranoia, and maintaining attention, but her testimony regarding constant medication side effects, an inability to go in grocery stores, and persistent problems with encountering men in general are similarly not well corroborated by the aforementioned evidence since the alleged onset date that indicates she has been engaging in some work activity with driving a taxi, delivering orders for DoorDash, or babysitting over the last 5 years as well as other recent evidence that indicates she planned to take her children to a new park every week this past summer, she went shopping in a store alone to purchase socks for her children, and she took her children to Skate World (B1A, B4A, B5A, B8A, B9A, B3E, B1F, B2F, B9F, and B14F). The undersigned therefore concludes her medically determinable impairments can be adequately accommodated by a range of simple and routine tasks at the light exertion level with a sit-stand option, no set hourly quotas, occasional interactive co-worker and supervisor contact, no direct interactive public contact, occasional changes in the routine work setting, frequent pushing, pulling, handling, or reaching, no exposure to certain hazards such as moving machinery or unprotected heights, no commercial driving job responsibilities, no use of hand-held vibrating or power tools, no frequent concentrated exposure to extreme temperatures, high humidity, or pulmonary irritants, no climbing of ladders, scaffolds, and ropes, and no more than occasional stooping, crouching, kneeling, crawling, or climbing stairs with handrails.

9

No deference or specific evidentiary weight such as controlling weight is given to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources, but they have been considered in accordance with 20 CFR 404.1520c and 416.920c.

The aforementioned medical opinion from Dr. Hassett is somewhat persuasive to the extent it is consistent with and supported by his neurological treatment records, but the undersigned has considered the claimant's testimony in concluding that she should have some upper extremity restrictions related to her medically determinable impairments such as no use of hand-held vibrating or power tools and no more than frequent pushing, pulling, handling, or reaching to avoid unnecessary aggravation of her symptoms (B10F, B12F, and B16F).

The prior administrative medical findings from Drs. Johnston, Amiri, Souder, and Bolz are mostly persuasive to the extent they are generally consistent with and supported by the evidence available at the time they were authored, although the undersigned has considered the claimant's testimony and other evidence received at the hearing level in allowing for a sit-stand option, further restricting her from hourly quotas, direct interactive public contact, commercial driving, use of hand-held vibrating or power tools, more than occasional kneeling, crouch, or climbing of ramps or stairs, more than frequent pushing, pulling, handling, or reaching, and no frequent concentrated exposure to extreme temperatures, high humidity, or pulmonary irritants (B4A, B5A, B8A, B9A, B1F, B2F, B3F, B4F, B5F, B6F, B7F, B8F, B9F, B10F, B12F, B13F, B14F, B15F, and B16F).

Tr. 33–37.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.

2. The claimant has not engaged in SGA since March 14, 2019, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: right carpal tunnel syndrome; peripheral neuropathy; cervicalgia; degenerative changes of the lumbar spine; asthma; obesity; post-traumatic stress disorder (PTSD); anxiety; bipolar disorder; and learning disability (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following exceptions: she is limited to simple and routine tasks with no set hourly quotas; she can have no more than occasional interactive contract with co-workers and supervisors; she can have no direct interactive contact with the public; she can have no more than occasional changes in the routine work setting; she can lift and/or carry 10 pounds frequently and 20 pounds occasionally; she can stand and/or walk with normal breaks for 6 hours in an 8-hour workday, but she requires the opportunity to stand for 15 minutes at 1 time before needing to sit for 2 minutes prior to the

resumption of sanding while remaining on task; she can sit with normal breaks for 6 hours in an 8-hour workday, but she requires the opportunity to sit for 15 minutes at 1 time before needing to stand for 2 minutes prior to the resumption of sitting while remaining on task; she can perform pushing and pulling motions with the upper and lower extremities with the aforementioned weigh restrictions for 2/3 of an 8-hour workday; she can perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching for 2/3 of an 8-hour workday; she needs to avoid hazards such as moving machinery and unprotected heights, but she does not need to avoid hazards typically found in the workplace such as boxes on the floor or ajar doors; she can have no commercial driving job responsibilities; her job responsibilities cannot include the use of hand-held vibrating or power tools; she needs to be restricted to a work environment that allows her to avoid frequent concentrated exposure to extreme heat, extreme cold, high humidity, and pulmonary irritants such as fumes, dust, gases, and smoke; and she can occasionally stoop, crouch, kneel, crawl, and climb stairs with handrails, but she needs to avoid climbing ladders, scaffolds and ropes.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 9, 1988 and was 30 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

12

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy she can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 14, 2019 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 28–38.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step, sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is

13

disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008); *see also* Social Security Ruling 11-2p, 2011 WL 4055665, at *3 (Sept. 12, 2011) (setting out the same five-step analysis for cases involving "young adults"). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

14

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at 103 (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. Thompson has not established that Sentence Six Remand is appropriate.*

Thompson's first issue arises out of the Appeals Council decision not to incorporate into the record a medical-provider opinion from PMHNP Cox, which was submitted approximately three months after the ALJ issued his decision. *See* Doc. 7, at 7. Specifically, she claims that the Appeals Council's finding that there is not "a reasonable probability that [the opinion] would change the outcome of the decision," Tr. 2, was "not supported," Doc. 7, at 7. For the reasons explained below, Thompson's argument does not provide a basis for remand.

The Sixth Circuit "has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996)). But remand may be appropriate based on the sixth sentence of Section 405(g) "for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Id.*; *see also* 42 U.S.C. § 405(g). Stated differently, a claimant must establish three predicates to show that remand under sentence six is appropriate: (1) that the evidence is new or otherwise unavailable; (2) that the evidence is material; and (3) that there is good cause for failing to submit the evidence to the ALJ. *See*

*Glasco v. Commissioner of Social Sec.*, 645 F. App'x 432, 435 (6th Cir. 2016) (citation omitted). "Failure to establish any one of these three elements is fatal to the moving party's request." *Id.* (citing *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). In this context, "evidence is 'material' only if there is 'a reasonable probability that the [ALJ] would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore*, 865 F.2d at 711).

Here, Thompson does not provide any basis to support her claim that PMHNP Cox's opinion was material. Although it is Thompson's burden to show that "there is 'a reasonable probability that the [ALJ] would have reached a different disposition … if presented with the new evidence,'" *see Prater v. Comm'r of Soc. Sec.*, 235 F. Supp. 3d 876, 880 (N.D. Ohio 2017) (quoting *Sizemore*, 865 F.2d at 711), Thompson only asserts that, in her opinion, PMHNP Cox's opinion "contradicted the ALJ's decision in multiple ways." Doc. 7, at 9. In support of this assertion, Thompson simply cites aspects of PMHNP Cox's opinion that she believes contradict the ALJ's RFC finding. *Id.* at 9–10. But she notably does this without citing the ALJ's decision. Without more, the Court is left to speculate as to what portions of the ALJ's decision Thompson believes are contradicted by PMHNP Cox's opinion.

Thompson also fails compare PMHNP Cox's opinion with the other evidence in the record. This matters because "[a] post-decision evaluation is not material if it is cumulative of evidence already in the record, or if it merely

17

shows a worsening condition." *Prater*, 235 F. Supp. 3d at 880. Thompson has made no attempt to show that PMHNP Cox's evaluation is not cumulative of evidence already available to the ALJ at the time he issued the decision. She likewise does not argue that PMHNP Cox's opinion shows a worsening condition, let alone something more than a worsening condition. So Thompson has not shown that PMHNP Cox's opinion is material.

Lastly, Thompson does not show that there was "good cause" for her failure to present PMHNP Cox's opinion before the ALJ issued his decision. *See Foster*, 279 F.3d at 357. In fact, Thompson explicitly does not discuss the issue of whether she can show good cause for her failure to provide PMHNP Cox's opinion before the ALJ issued his decision. *See* Doc. 7, at 8 n.2. Instead, Thomspon makes the conclusory assertion that she "had good cause as indicated in the regulations" and simply provides a timeline to illustrate that "the evidence could not be received prior to or as of the date of the hearing." *Id*. at 8–9. As the Commissioner points out, the Sixth Circuit requires that the claimant "give a valid reason for his failure to obtain evidence prior to the hearing." Doc. 8, at 12 (citations omitted). In *Oliver v. Sec'y of Health & Human Servs.*, the Sixth Circuit affirmed the District Court's denial of remand and held that a claimant failed to show good cause where, although the dates on reports showed that they were created after the hearing and therefore could not have been presented at the hearing, the claimant did not offer any valid reason for his failure to obtain the reports before the hearing. 408 F.2d 964,

966 (6th Cir. 1986). As in *Oliver*, Thompson does not offer any explanation, let a *valid reason*, for her failure to obtain an opinion from PMHNP Cox before the hearing. *See* Doc. 7, at 8–9. Perhaps this is because, as discussed above, PMHNP Cox's opinion is based on evidence already in the record and it *could have been* obtained before the hearing.

Because Thompson has failed to establish that PMHNP Cox's opinion was material and has not shown good cause to excuse its untimely presentation, her first argument fails.

> 2. *The sit-stand limitations that the ALJ included in Thompson's RFC are supported by substantial evidence.*

Thompson's second argument concerns the specific sitting-and-standing limitations that the ALJ provided in her RFC assessment. Doc. 7, at 10. In particular, Thompson claims that because the ALJ's decision lacked "narrative support to … key limitations," it is "foundationally flawed warranting remand." Doc. 7, at 10. Thompson enumerates two arguments why the ALJ's decision was "problematic" in this regard. *Id*. at 11–12.

Thompson asserts that the ALJ failed to "explain how [a] specific alternation pattern" that he identified from Thompson's testimony "was tethered to the record." *Id*. at 11. She says this is problematic, first, because "the ALJ's failure to provide meaningful review stops this from qualifying as a harmless error." *Id*. at 11. Thompson, however, does not support her assertion with anything to show that the ALJ failed to *provide meaningful review*. *Id*. As a result of Thompson's conclusory argument, it is unclear how Thompson

19

believes the ALJ failed in this regard such that the Court can *provide meaningful review* of her argument. It is for this reason that conclusory arguments like Thompson's are deemed forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted). So Thompson's first argument does not support remand.

Second, Thompson claims that the ALJ's alleged lack of narrative support "was factually harmful." *Id*. at 12. Again, this is a conclusory argument unsupported by citation to show that it provides a basis for remand. *See McPherson*, 125 F.3d at 995. Moreover, and contrary to Thompson's argument, the ALJ did include an explanation connecting the relevant record evidence to the sitting and standing limitations included in Thompson's RFC. For example, the ALJ specifically recognized that "changing positions seems to help manage [Thompson's] symptoms" when explaining how he considered Thompson's testimony when explaining his RFC determination. Tr. 36. Additionally, the ALJ explained that he accounted for Thompson's mental health related symptoms and concluded that "her medically determinable impairments can be adequately accommodated by a range of simple and routine tasks at the light exertion level *with a sit-stand option*[.]" Tr. 36 (emphasis added).

A further problem with Thompson's second argument is that the only thing that she cites in support are portions of her testimony, which she apparently believes support a different limitation. Doc. 7, at 12. This argument is flawed because even if the testimony Thompson cites could support a different outcome, the mere presence of contradictory evidence does not show that the ALJ failed to consider it. *See, e.g., Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022) ("Although Plaintiff understandably disagrees with the ALJ's decision, the law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC. And … the ALJ cannot be expected to discuss every piece of evidence that Plaintiff believes is inconsistent with the RFC."), *report and recommendation adopted*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022). The presence of evidence that could support a contradictory outcome also does not, as it must to support remand, show that ALJ's decision was unsupported by substantial evidence. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Instead, at best, Thompson's argument shows that substantial evidence exists to support a different outcome, which is entirely permissible. *See Jones*, 336 F.3d at 477. Moreover, to the extent that Thompson takes issue with the specificity that the ALJ included with regard to the sit-stand options in the RFC, *see* Doc. 8, at 12, she has not pointed to any authority to support her implied argument that the ALJ's chosen specificity justifies remand.

Thompson's second issue does not provide a basis for remand.

**Conclusion**

For all of the reasons stated, I recommend that the ALJ's decision be affirmed.


Dated: February 13, 2026                    */s/ James E. Grimes Jr.*
                                            James E Grimes Jr.
                                            United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).